12 P.3d 1194

Kevin McDONALD, Plaintiff–Appellant,

v.

Melvin THOMAS, Complex Warden,
Defendant–Appellee.

No. 1 CA–HC 00–0001.

Court of Appeals of Arizona,
Division 1, Department E.

Nov. 2, 2000.

Janet A. Napolitano, Arizona Attorney General by Thomas I. McClory, Assistant Attorney General, Phoenix, Attorneys for Appellee.

Kevin McDonald, Florence, In Propria Persona.

## OPINION

BERCH, Presiding Judge.

¶ 1 Kevin McDonald ("Appellant") appeals the trial court's denial of his petition for habeas corpus. Appellant requested that the trial court declare invalid former Governor Symington's denial of his request for commutation of his life sentence and order his release from prison. For the following reasons, we affirm the trial court's ruling.

## FACTS

¶ 2 Appellant is serving a life sentence with no possibility of parole for twenty-five years. Pursuant to statutory authority, the Arizona Board of Executive Clemency ("the Board") conducted a disproportionality review hearing on 'May 10, 1995, and voted unanimously to recommend to the governor that Appellant's sentence be reduced or "commuted" from life to 8.5 years.

¶ 3 The Disproportionality Review Act provided that if the Board "unanimously recommend[s] commutation and the governor

fails to act on that recommendation *within ninety days after receiving* the recommendation, the recommendation for commutation automatically becomes effective." 1994 Ariz. Sess. Laws, ch. 365, § 1(G) (emphasis added).[1] The Board's recommendation for commutation of Appellant's sentence was delivered to the governor's office on August 17, 1995. On November 15, 1995, the ninetieth day, the governor's office notified the Board that the governor had denied its recommendation to commute Appellant's sentence. On November 16, 1995, Appellant received a letter from the Board's chairman advising Appellant that the governor had decided not to commute his sentence.

¶ 4 Appellant filed a petition for writ of habeas corpus. On October 13, 1999, after conducting a telephonic hearing, the trial court issued an order dismissing the petition. Appellant filed a timely appeal, over which we have jurisdiction pursuant to Arizona Revised Statutes Annotated ("A.R.S.") section 12–2101(L) (1994).

### DISCUSSION

■ ¶ 5 Appellant alleges that the trial court abused its discretion by denying his habeas corpus petition. As Appellant correctly notes, the decision whether to issue a writ of habeas corpus is entrusted to the sound discretion of the trial court, and we will not disturb the trial court's decision unless we see an abuse of that discretion. *Salstrom v. State*, 148 Ariz. 382, 384, 714 P.2d 875, 877 (App.1986).

#### A. Did the governor deny the recommendation in a timely manner?

##### 1. Date of Response

■ ¶ 6 Appellant claims that he is entitled to release from prison because the governor did not deny commutation of his sentence within ninety days after the Board held its May 10, 1995 hearing. He also claims that the denial occurred more than ninety days after the Board notified him of its recommendation on May 12, 1995, and more than ninety days after the letter recommending commutation, which was dated August 15, 1995, was sent from the Board to the governor.

¶ 7 Appellant, however, misidentifies the legally operative date that commences the ninety-day period. By statute, the period is calculated from the date the governor *receives* the Board's recommendation: August 17, 1995. *See* 1994 Ariz. Sess. Laws, ch. 365, § 1(G) (governor must act "within ninety days after receiving the recommendation"). Commutation of Appellant's sentence was denied on November 15, 1995, the ninetieth day after the governor's office received the Board's recommendation. *See* A.R.S. § 1–243(A) (1995). It was therefore timely.

■ ¶ 8 The date of receipt is established by the affidavit of the Board employee, E.M., who hand-delivered the recommendation to the governor's office on August 17, 1995, and the document titled "Receipt," which is dated August 17, 1995. Appellant's controverting evidence consisted of an affidavit from his mother alleging that someone who answered the telephone at the governor's office confirmed on more than one occasion that the recommendation had been received earlier, although the date of receipt and the identity of the speaker are not specified. However, a statement from a person other than the affiant offered for the truth of the matter asserted constitutes hearsay unless the proponent of a party admission can show that the statement (1) was made by the opposing party's representative or is a statement with which the party has manifested agreement, (2) was made during the existence of the relationship, and (3) concerned a matter within the scope of the speaker's employment. Ariz.R.Evid. 801(d)(2); *Diaz v. Magma Copper Co.*, 190 Ariz. 544, 551–52, 950 P.2d 1165, 1172–73 (App.1997); *Shuck v. Texaco Ref. & Mktg., Inc.*, 178 Ariz. 295, 298, 872 P.2d 1247, 1250 (App.1994). The record does not reflect that the statements by the unidentified office worker to whom Appellant's mother allegedly spoke were within the scope of the unidentified person's duties or that the governor's office had manifested agreement with them. They are therefore not judicially cognizable. *See Diaz*, 190 Ariz. at 551–52, 950 P.2d at 1172–73; *Shuck*, 178 Ariz. at 298, 872 P.2d at 1250. By ruling in the State's favor, the trial court must implicitly have found the State's evidence more persuasive, and we defer to that finding. *See*

---

1. The Act went into effect on July 17, 1994, and was repealed on June 30, 1996. *Id.* § 3.

*Gutierrez v. Gutierrez*, 193 Ariz. 343, 347, ¶ 13, 972 P.2d 676, 680 (App.1998) (requiring deference to trial court's determination regarding weight to give to conflicting evidence).

### 2. *Time of Response*

■ ¶ 9 Appellant next maintains that, because the receipt and Board recommendation documents lack a time stamp in addition to the date stamp, E.M.'s affidavit provides insufficient documentation regarding precisely when on August 17 the recommendation was received by the governor's office. We conclude, as did the trial court, that the signed and dated "Receipt" and recommendation, together with the signed affidavit, provide sufficient evidence of the *date* of receipt, which answers the question before us. In Arizona, the time in which an act is required to be done is "computed by excluding the first day and including the last day," A.R.S. § 1–243(A); the hour of delivery or receipt is irrelevant. Thus, the governor was authorized to act on the Board's recommendation until the end of the full day on November 15, no matter what time on August 17 the recommendation was received.

### 3. *Date of Receipt by Governor's Office*

¶ 10 Appellant notes that the August 17, 1995 date typed on the "Receipt" shows the date typed by the ·sending agency rather than the receiving agency. From this he concludes that it does not show the date the document was received by the governor's office. Even if Appellant were correct, however, his conclusion would merely mean that the document might have been received after August 17, 1995. Such a conclusion fails to further Appellant's position.

■ ¶ 11 Finally on this point, Appellant contends that the Board failed to forward its recommendation to the governor in a timely manner. We note, however, that the Act did not require the Board to send its recommendation within a specified number of days

following the hearing. The only requirement imposed to ensure that the Board would act expeditiously was that the Board "complete all disproportionality reviews by December 31, 1995." 1994 Ariz. Sess. Laws, ch. 365, § 1(I). The Board met the legislative deadline with more than four months to spare. We therefore find no merit to this claim.

### B. Is denial of clemency an "official act"?

■ ¶ 12 Appellant contends that the letter and "Receipt" by which his commutation was denied were ineffective to do so because they were not signed by the governor, but instead were signed by a representative of the governor.[2] Appellant maintains that the denial of commutation constitutes an "official act," requiring the governor's signature, the secretary of state's attestation, and the affixation of the seal of the State of Arizona to the document in order to authenticate the act and make it valid. *See* A.R.S. §§ 41–101(B) (1999), –121(2) and (4) (Supp.1999–2000). He reasons that without these, the denial was void and he must be released. We must therefore determine whether the denial of a clemency request is an official act requiring the statutory formalities.

¶ 13 Along with many other powers, the governor has the power to grant commutation and other forms of clemency. Ariz. Const. art. 5, § 5; A.R.S. § 31–443 (1996). Arizona's clemency system is unique, however, in that it delegates the majority of the decision-making power to the Board of Executive Clemency. A.R.S. § 31–402 (Supp. 1999–2000). As one article described the system, "The functional consequence of this clemency legal structure is to largely remove the Governor from the dynamics at work in a clemency effort, while still affording the Governor the power to ultimately decide on an alternative recommendation of clemency." David Kader and Keith Olbricht, *The Quality of Mercy: A History of Clemency in Arizona*, The Defender 15 (July 2000).[3]

2. The form from the Board that constitutes the letter of denial provided only a line for a signature by the "Governor or Representative." See attached document. Appellant argues, without support from the record, that the illegible signature on the document in question is not the governor's signature.

3. The article reports that the limitation on the governor's power to pardon, parole, or grant clemency resulted from public outrage at the perceived abuses of the power by Territorial Governor Richard E. Sloan, who granted 293 commutations and eleven pardons between 1911 and

¶ 14 In 1994, the legislature passed an Act authorizing the Board of Executive Clemency to review sentences of certain inmates to ensure that their sentences were not disproportionate to the sentences of others similarly situated. 1994 Ariz. Sess. Laws, ch. 365, §§ 1, 3 (effective July 17, 1994 through June 30, 1996). During the eighteen months that disproportionality reviews occurred, the Board considered the sentences of more than 1500 inmates, recommending commutation of the sentences of 216, including Appellant. *See* Kader, *supra* at 16 (citing 1993–95 Annual Reports of the Arizona Board of Executive Clemency). Of those 216, then-Governor Symington commuted the sentences of sixteen inmates. *Id.*

¶ 15 Appellant maintains that each grant or denial of commutation is an "official act" that must be signed by the governor, sealed, and attested by the secretary of state. Moreover, as an official act, it must be recorded in the record of official acts performed by the governor. *See* A.R.S. §§ 41–102 (1999), –121(2).

¶ 16 Whether an act constitutes an "official act" depends upon the purpose of the inquiry. In its generic sense, the term applies to all "acts by an officer in his official capacity under color and by virtue of his office." *Ruiz v. Hull,* 191 Ariz. 441, 449, ¶ 31, 957 P.2d 984, 992 (1998) (quoting *Kerby v. State ex rel. Frohmiller,* 62 Ariz. 294, 310–11, 157 P.2d 698, 705–06 (1945)). Such a definition assists in determining, for example, when statutory immunities might shield a public employee from liability, *see* A.R.S. § 12–820.02 (Supp.1999–2000), or when state insurance might be afforded for acts done within the course and scope of public employment. *See* A.R.S. § 41–621 (1999). For these purposes, nearly all acts performed in an official capacity are "official acts." Such a determination, however, does not require that each act of every state officer be signed by the governor and attested by the secretary of state. *See State v. Medrano–Barraza,* 190 Ariz. 472, 474, 949 P.2d 561, 563 (App.1997) (court interprets statutes so as to avoid absurd results).

¶ 17 Although neither the legislature nor the courts have specified those official acts

the grant of statehood in February, 1912. *See*

that require the governor's signature, affixation of the state seal, and attestation by the secretary of state, it would seem that such formality and ceremony would be reserved for resolutions setting public policy, such as "decision[s] or determination[s] of a sovereign, a legislative council, or a court of justice," *Ruiz,* 191 Ariz. at 449, ¶ 30, 957 P.2d at 992 (citing Op. Ariz. Att'y Gen. I89–009, 5–7), and would include such policy-enunciating acts as "formal rule-making or rate making . . . or any other policy matters." *Id.* at ¶ 31, 957 P.2d 984. A governor's decision regarding commutation in an individual case is not of this magnitude. While important, indeed critical to the individual affected, such decisions do not set state policy or affect the public at large.

¶ 18 The sheer number of commutation, parole, and clemency requests also militates in favor of the conclusion that the decision at issue here was not an official act of the sort that required attestation by the secretary of state and entry on the official register in order to be valid. As noted above, the Board reviewed more than 1500 requests and forwarded 216 commutation recommendations to the governor's office in the brief months during which disproportionality reviews were authorized. The record does not reflect the numbers of parole and clemency requests that were presented during the same period. Requiring the governor to sign while the secretary of state is present to attest each grant or denial seems an undue imposition on our heads of state and burdens the functioning of government. *See Medrano–Barraza,* 190 Ariz. at 474, 949 P.2d at 563; *Forino v. Arizona Dep't of Transp.,* 191 Ariz. 77, 80, 952 P.2d 315, 318 (App.1997) (court "may consider the effect and consequences of alternative construction").

¶ 19 Moreover, by the terms of the disproportionality review statute, if the governor failed to act—an action that cannot be sealed or attested by the secretary of state—the commutation is deemed granted. If *granting* commutation, even if by non-action, can be validly accomplished without attestation—indeed without a signature of any kind—then *denying* commutation, which has

Kader, *supra* at 15–16.

the effect of continuing an applicant's inmate status and requiring the inmate to serve the sentence originally imposed, surely must also be able to be effected without seal and attestation.

¶ 20  We note, too, that the Act itself did not provide that the denial of commutation constituted an "official act" requiring the governor's signature. *See* 1994 Ariz. Sess. Laws, ch. 365. Instead, in a lengthy section describing the Board's duties in the disproportionality review process, the Act stated that if the governor failed to timely act on the Board's recommendation, the recommendation would become effective. *See id.* § 1(G). By its silence, the Act made clear that the governor lacked any power to commute a sentence unless the Board first unanimously recommended that commutation be granted. *See State ex rel. Arizona State Bd. of Pardons and Paroles v. Superior Court,* 12 Ariz.App. 77, 79–80, 467 P.2d 917, 919–20 (1970), *supplemented on reh'g,* 12 Ariz.App. 228, 469 P.2d 120 (1970) (holding that power to grant parole rests in Board, not in governor); *Laird v. Sims,* 16 Ariz. 521, 529, 147 P. 738, 740 (1915) (upholding constitutionality of clemency system); A.R.S. § 31–402(A) (giving Board "exclusive power to pass upon . . . commutations"). The Board's action, of course, was not an official act that required attestation. We conclude that the governor's decision similarly did not need to be attested.[4]

¶ 21  We are also mindful of the practical effect of finding that the decision at issue constituted an official act requiring attestation: Assuming that the governor's office acted to grant or deny all 216 commutation recommendations as it seems to have acted on this one—that is, by having an employee of the governor's office, but perhaps not the governor him or herself, sign the document— then presumably the other 199 applicants whose commutations were recommended by the Board but denied by the governor's office would be entitled to commutation as well, a result clearly at odds with the governor's decision in each case. *Cf. State v. Cornish,* 192 Ariz. 533, 537, ¶ 16, 968 P.2d 606, 610

(App.1998) (in construing statutes, courts apply practical, common-sense construction); *State v. Garcia,* 189 Ariz. 510, 513, 943 P.2d 870, 873 (App.1997) (in construing statutes, courts consider consequences and effects of decisions).

¶ 22  Other practical obstacles block Appellant's road. First, the record contains a signed document indicating that, within the ninety-day period, the governor elected to deny commutation of Appellant's sentence. We presume that public officials have done their duty. *See Verdugo v. Indus. Comm'n,* 108 Ariz. 44, 492 P.2d 705 (1972); *see also Swartz v. Superior Court,* 105 Ariz. 404, 406, 466 P.2d 9, 11 (1970) (acts of public officials are presumed to be correct and legal). No evidence in the record shows that the governor did not do so in this case.

¶ 23  Appellant cites *Verdugo v. Industrial Commission* for the proposition that the presumption that officials have done their duty does not apply with full force to actions of the Industrial Commission. 108 Ariz. at 44, 492 P.2d at 705. This is not an Industrial Commission case, however, and therefore the exception does not apply. Moreover, the *Verdugo* exception is subject to the further exception that it does not apply if "something in the file show[s] that the Commission did, in fact, consider the matter and act accordingly." *Id.* at 48, 492 P.2d at 709. In this case, a signed document in the record shows that the governor has acted. The governor was asked to consider the Board's recommendations to grant commutation for a group of twenty-eight inmates, one of whom was Appellant. The governor did not automatically grant or deny all; instead, he commuted the sentences of two of the individuals submitted in the group of recommendations that included the recommendation on Appellant's sentence. He denied the Board's recommendations with respect to Appellant and twenty-five others. Thus, "something in the file show[s] that the [governor] did, in fact, consider the matter and act accordingly."

---

4. Our dissenting colleague asserts that we are dealing with "clear statutory requirements." Dissent, ¶ 41. Having scoured the statute, however, we find the words "official" or "officially"

nowhere within it, nor do we see any language commanding or indeed even suggesting that the governor must act officially or the action will be void.

*Id.* For all these reasons, *Verdugo* does not apply here.

¶ 24 Second, even if evidence had been presented showing that the signature on the denial form was not that of the governor, we note that the governor may delegate authority and, as a practical matter, often does so. *See, e.g.,* A.R.S. § 26–302 (2000) (regarding delegation of emergency management powers). The power to delegate applies to such critically important powers as the emergency power to "[s]uspend the provisions of any statute prescribing the procedure for [the] conduct of state business," *id.* § 26–303(A)(1) (2000), the power to commandeer property or personnel, *id.* § 26–303(A)(2), the power to exercise "complete authority over all agencies of the state government" and "all police power vested in the state by the constitution and laws of this state." *Id.* § 26–303(B), (E)(1) (2000). Indeed, the governor may provide even for the subdelegation—the delegation of already delegated power—of some critical powers. A.R.S. § 26–1140 (2000). If such important powers may be delegated, it follows that so, too, may the power to continue Appellant's status as an inmate to serve the term to which he was sentenced.

¶ 25 Delegation connotes the passing of authority to do particular acts. *See generally* Op. Ariz. Att'y Gen. I79–146. There is no evidence in this case, however, that the governor did delegate authority. Instead, the record appears to reflect nothing other than that the governor exercised the required judgment, but may have had another record the decision. The governor has the power to designate representatives for the efficient discharge of the duties of the office and often does so. *Cf.* A.R.S. § 38–461(A) (1996) ("Every state officer . . . may appoint clerks and employees for the prompt discharge of the duties of the office."). It would be impractical, if not impossible, to expect every gubernatorial function to be performed by the governor. *See, e.g., Shields v. Bennett,* 8 W.Va. 74, 89 (1874) (recognizing that a governor need not perform all executive acts personally), *overruled*

*in part by Simms v. Sawyers,* 85 W.Va. 245, 101 S.E. 467 (1919). We find nothing that prohibited Governor Symington from designating another to sign for him here. As a result, even if the signature on the document of record were not that of former Governor Symington, the record nonetheless contains no evidence that the governor did not simply direct an assistant to record the governor's assessment that Appellant's sentence should not be commuted. On this record, it cannot be said that the governor failed to act. We assume that the governor did his duty. *See Burri,* 102 Ariz. at 543, 434 P.2d at 629; *Verdugo,* 108 Ariz. at 44, 492 P.2d at 705.

¶ 26 Finally, we note that "Arizona places no substantive limitations on official discretion over the ultimate decision to grant or deny clemency." *Woratzeck v. Arizona Bd. of Exec. Clemency,* 117 F.3d 400, 403 (9th Cir.1997). No objective and defined criteria were necessary to guide the governor's decision. *Id.* The governor's discretion to act on the Board's recommendations remains unfettered, subjective, and a matter of grace, and the governor's commutation decisions generally fall outside the purview of the adjudicatory process. *See Wigglesworth v. Mauldin,* 195 Ariz. 432, 435–36, ¶¶ 8–10, 990 P.2d 26, 29–30 (App.1999). We will not infringe on the governor's powers here by imposing new procedural steps.

### C. The Dissent

¶ 27 Our dissenting colleague reasons that the governor's act of denying commutation is "necessarily" an official act because it parallels the president's power to grant pardons. Dissent, ¶ 38. Without digressing to discuss the difference between pardons and commutations or between the grant of such an order, which sets the petitioning party free, and denying it, which simply continues the petitioner's status, we note that the federal and state statutory schemes relating to presidential pardon and state-based clemency differ. Thus, that the president's exercise of the power to pardon may be an official act does not dictate the proper interpretation of Arizona's statute.[5]

---

5. Even in the federal system, one seeking a pardon has no right to insist that the president *"personally* consider the Attorney General's rec-

ommendation before acting." *Hoffa v. Saxbe,* 378 F.Supp. 1221, 1244 (D.D.C.1974) (emphasis in original).

¶ 28 The Dissent then assumes, in the absence of any proof and contrary to well-established law requiring a contrary result, that the governor did not sign and had no involvement in the denial of Petitioner's commutation. Dissent, ¶¶ 40, 42. We rely instead on those tested presumptions the law requires us to make. *See Verdugo,* 108 Ariz. at 44, 492 P.2d at 705 (requiring court to assume that government officials have done their duty).

¶ 29 The Dissent also fears that the commutation decision-making process may "slip[ ] from public scrutiny" if the act in question is not deemed official. Dissent, ¶ 42. To the contrary, however, we foresee no change in the level or quantity of review and believe that hopeful but aggrieved petitioners will continue to seek judicial review, as did Appellant here, thus bringing the process before the courts. The courts may then resolve concrete issues as they are presented in live cases by actual litigants.

¶ 30 In closing, the Dissent fears that we leave to the governor's "whim" the determination of when an act is sufficiently official to warrant attestation. *Id.* In these gray areas, however, we resolve that the elected official who bears the sting of an improper determination is the appropriate interpreter. We do not believe that a governor should make that determination at society's peril, discovering perhaps years after the fact that a court has determined an act arguably official to be so, and has invalidated an action long thought to have been completed. We conclude that attestation was meant to be an act of formality and ceremony, not a trap for the unwary or a windfall to those who wish to escape a sentence lawfully imposed.

### D. Did the court err by denying the petition at the hearing?

¶ 31 Appellant finally argues that the hearing was inadequate. However, Appellant has provided no evidence that he received anything less than a fair hearing. Although the hearing was brief, both sides were properly notified and were present, and the court read the filings and heard and considered argument on the petition before ruling.

## CONCLUSION

¶ 32 In conclusion, the governor denied the Board's recommendation in a timely manner. Furthermore, the governor acted as prescribed by law. We do not believe that attestation was intended to be a procedural trap. Rather, we conclude it was intended to be a solemnizing rite for acts of public policy. The trial court's order denying Appellant's habeas corpus petition is affirmed.

CONCURRING: ANN A. SCOTT TIMMER, Judge.

GERBER, Judge, dissenting.

¶ 33 I respectfully dissent on whether the commutation decision constitutes an "official act" requiring the governor's signature and attestation by the secretary of state.

¶ 34 Under the controlling statutes, the governor must act officially, within ninety days, on a unanimous recommendation from the Board; otherwise the Board's recommendation automatically becomes effective. A.R.S. § 31–402(D). The secretary of state must attest all "official" acts of the governor. A.R.S. § 41–101(B).

¶ 35 The action required under A.R.S. section 31–402(D) is an "official" act, which means any act of the governor under color or by virtue of his office. *Weidler v. Arizona Power Co.,* 39 Ariz. 390, 396, 7 P.2d 241, 243 (1932); *see also Kerby v. State ex rel. Frohmiller,* 62 Ariz. 294, 311, 157 P.2d 698, 706 (1945). No distinction exists between acts under color of office and those by virtue of office; both are "official" acts.

> Much mental energy has been expended in drawing distinctions between acts of public officers done *colore officii* and acts done *virtute officii,* and we shall not undertake to assemble definitions. Our understanding is [ . . . ] if his office gives him authority to act, he is acting in virtue of his office, although, in the performance of a specific duty, he [might] improperly exercise[ ] his authority.  .

*Weidler,* 39 Ariz. at 396, 7 P.2d at 243.

¶ 36 Pardon, clemency, and commutation are longstanding executive powers. "Official" presidential acts arise from the perfor-

mance of the important functions of that office. *Clinton v. Jones,* 520 U.S. 681, 693–94, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997).

> [T]he term "official act" means any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit.

18 U.S.C. § 201(a)(3) (2000).

¶ 37 The United States Supreme Court has described the presidential pardon power precisely as an "official" act: "A pardon is ... the private, though *official* act of the executive magistrate...." *Herrera v. Collins,* 506 U.S. 390, 413, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) (quoting Chief Justice Marshall's explication of the presidential pardon power in *United States v. Wilson,* 32 U.S. 150, 160–61, 7 Pet. 150, 8 L.Ed. 640 (1833) (mem.) (emphasis added)). It is difficult to view former President Ford's pardon of former President Nixon as anything other than an official act.

¶ 38 What is true of the nation's president in federal commutation decisions is also necessarily true of the governor's state commutation decisions because the executive powers are parallel. A governor's state commutation decision mirrors the identical presidential power. The Arizona constitution empowers solely the governor to grant or deny commutations. ARIZ. CONST. art. V, § 5. A governor who delegates the investigation is not thereby relieved of the final commutation decision. *See State ex rel. Ariz. St. Bd. of P. & P. v. Superior Court,* 12 Ariz.App. 77, 79, 467 P.2d 917, 919 (App.1970); *see also Woratzeck v. Arizona Bd. of Exec. Clemency,* 117 F.3d 400, 403 (9th Cir.1997) (interpreting governor's duty as "official" discretion).[6]

¶ 39 "All official acts of the governor, except approval of laws, shall be attested by the secretary of state." A.R.S. § 41–101(B). "The governor's signature can almost be viewed as a warrant for the secretary of state to sign and seal ...". Op. Ariz. Att'y Gen. I90–111. Here, denying commutation of McDonald's sentence, being an "official" act, required 1) the *governor himself,* not a representative, to act on and sign the recommendation within 90 days, and 2) the secretary of state to attest the signature as that of the governor.

¶ 40 The letter[7] purporting to be the governor's denial of commutation does not begin to meet the requirements for an official act. It does not show any act at all by Governor Symington (he did not sign it) nor the attestation of the secretary of state. The letter, which is not on the governor's stationary, does not allow for proper signatures of the governor and secretary of state, but it does allow for signature by a "representative" of the governor, as the illegible signature suggests occurred.

¶ 41 The Majority's view that the clear statutory requirements, if enforced, would inconvenience the governor is misguided in its largesse. This Court is not the governor's handmaid. The issue is not whether the governor is inconvenienced by the law but whether he satisfied it. Convenience is the standard of interpretation neither for this Court nor for the executive. If the statutory requirements for an official act trouble the governor's office, relief can be sought in the legislature. Until that happens this Court cannot soften the statutory commands in order to excuse the governor from his constitutional obligation to sign and have attested his commutation decisions. When "the plain language ... is clear and unequivocal, we find it determinative." *Barry v. Alberty,* 173 Ariz. 387, 390, 843 P.2d 1279, 1282 (App.1992).

¶ 42 One of the most important reasons for the signature and attestation requirements is to prevent gubernatorial activity from slipping below public scrutiny. The Majority's declaration in ¶ 29 about judicial review misses the point; the issue is not judicial review but the public's assurance of personal gubernatorial action. Far from pomp and ceremony, the requirements of signature and attestation reflect the need for assurance of personal decision-making. The Majority's opinion leaves the governor to de-

---

**6.** The discussion is truncated; it focuses on due process considerations within the context of a clemency hearing.

**7.** See attached.

cide, at his whim, which decisions are "official" enough to be attested by the secretary of state; worse, it allows someone other than the governor to make these decisions. It is indiscernible from the attached document whether the governor or someone else decided this commutation issue; the illegible scrawl suggests it was not the former.

¶ 43 This "official" commutation denial reflects no gubernatorial involvement at all and lacks both the governor's signature and attestation by the secretary of state. Therefore, I find no proper gubernatorial decision within the ninety-day period, and accordingly in my view the recommendation of the Board should become effective.

Mr. Duane Belcher Sr., Chairman
Arizona Board of Executive Clemency
1645 W Jefferson, Suite 326
Phoenix, AZ 85007

Dear Mr. Belcher:

The following application for executive clemency has been reviewed by the Governor. Documents submitted to our office for our review are being returned to you under this cover and the Governor's decision is as follows:

| Applicant's Name | ADOC# (if any) | Type of Action | Governor's Decision |
|---|---|---|---|
| Kevin McDonald | 80265 | Disportionality | *denied* |

Governor or Representative            Date  11-15-95